**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

RAHEEM RAHMAN,

    Plaintiff,

    v.

                                 Civil Action No.:  JRR-23-3260

WARDEN J. NINES, et al.,

    Defendants.

**MEMORANDUM OPINION**

Self-represented Plaintiff Raheem Rahman, an inmate presently incarcerated at Western Correctional Institution in Cumberland, Maryland, filed the above-captioned civil rights action pursuant to 42 U.S.C. § 1983 against Warden J. Nines, Sgt. Brian Iames, Lt. Jeffrey Brewer, Sgt. Judy, Nurse Burnice Mace, and YesCare Corp. ("YesCare").[1]  ECF No. 1.  Mr. Rahman alleges he was subject to harassment and retaliation, which has prevented him from receiving adequate medical care.  *Id.*

On June 3, 2024, Defendants Mace and YesCare (the "Medical Defendants") filed a Motion to Dismiss or Alternatively for Summary Judgment.  ECF No. 25.  On June 14, 2024, Defendants Nines, Iames, Brewer, and Judy (the "State Defendants") filed a Motion to Dismiss or, in the Alternative, for Summary Judgment.  ECF No. 28.  Mr. Rahman opposes the Motions.  ECF No. 33.  Medical Defendants replied.  ECF No. 34.

Having reviewed the submitted materials, the Court finds that no hearing is necessary. Local Rule 105.6 (D. Md. 2023).  For the reasons set forth below, the Medical Defendants' Motion will be granted and the State Defendants' Motion will be granted in part and denied in part.

---

[1] The Clerk shall be directed to amend the docket to reflect Defendants' full and correct names.

## BACKGROUND

### A. Plaintiff's Complaint

Mr. Rahman claims that he was targeted and harassed by officers while he was incarcerated at North Branch Correctional Institution ("NBCI") and Warden Nines knowingly took no remedial actions. ECF No. 1 at 2. He also claims that the medical staff at NBCI denied him treatment at the officers' direction. *Id.*

According to Mr. Rahman, on January 3, 2023, he was in a "heated exchange" with Sgt. Bulger about officers' racial aggression toward him and other men on his tier. ECF No. 1 at 3. After learning of this conversation, Sgt. Iames allegedly fired Mr. Rahman from his job and removed him from his single cell. *Id.* Later, on April 8, 2023, he received a "fabricated adjustment" from Officer Hochard at the direction of Sgt. Iames and Sgt. Bulger. *Id.* Mr. Rahman was placed in lockup but the charges were dismissed because the video evidence exonerated him. *Id.* He was removed from lockup on April 12, 2023, but could not return to his cell in the honor building; he was instead sent to the "the worst building" in NBCI because Sgt. Iames did not want Mr. Rahman in his building. *Id.*

Concurrently, Mr. Rahman states that he injured his knee around April 2, 2023; Officer Klink reported his injury to the medical staff. ECF No. 1 at 4. He says he was never examined and submitted multiple sick calls before he was seen on April 6, 2023, but still was not treated. *Id.* Mr. Rahman finally received crutches on April 12, 2023, from a Physician Assistant who happened to see him struggling to walk into a building. *Id.* He was also assigned to a single cell. *Id.* Mr. Rahman opines that the officers did not like this and on May 21, 2023, Lt. Brewer told Nurse B. Mace to take the crutches from him so that his single cell order could be revoked. *Id.* Mace

complied and he lost his cell and crutches. *Id.* Having to compensate for his injured knee, Mr. Rahman hurt his other knee. *Id.* at 5.

Dr. S. Arnoult saw Mr. Rahman on June 14, 2023, and reinstated the medical orders. ECF No. 1 at 5. The officers did not execute the doctor's orders until June 24, 2023. *Id.* Still, Mr. Rahman asserts that the pain he experiences while walking has not been addressed and he has not had an MRI to assess the ligament damage in both knees. *Id.* Mr. Rahman states that during this time, the campaign of harassment continued; his property was taken, he was denied religious services, and he could not return to the honor building. *Id.*

Mr. Rahman received another "fabricated adjustment" on September 1, 2023, and was moved to lockup. ECF No. 1 at 5. He was found not guilty on September 12, 2023. *Id.* at 6. His crutches were taken by a nurse on September 19, 2023, because the officers told her that he did not need them and his medical cell order was rescinded. *Id.*

On September 22, 2023, Mr. Rahman was brought to the medical building in a wheelchair because he could not walk without his crutches. ECF No. 1 at 6. He states that while there for a "psyche pass" he was kept there by Officer Engle and Lt. Brewer while all the other inmates left. *Id.* They made him get out of the wheelchair and instructed him to walk back to his building. *Id.* When he told them he could not walk unassisted, they denied him help and took him to lockup again. *Id.* The lockup cell was without electricity. *Id.* at 7. Mr. Rahman, who needs machine assistance to breathe properly while sleeping, told the tier officer of his problem but received no help that day or the next. *Id.* He also informed Sgt. Judy of his need to use the machine but he did nothing. *Id.* Mr. Rahman was in the lockup cell until October 4, 2023, during which time he states that he slept approximately 10 hours because he was afraid to sleep. *Id.*

Mr. Rahman was found not guilty after a hearing on October 3, 2023. ECF No. 1 at 7. When he was released from lockup, he was told to walk back to his building and threatened with another adjustment if he did not do so. *Id.* To avoid having to stay in the lockup cell, Mr. Rahman attempted to walk on his own back to his building. *Id.* His knee gave out and he was wheeled to the medical building. *Id.* at 7–8.

At the time of filing, Mr. Rahman stated that the harassment was ongoing – he was denied religious services, called names, and was placed on administrative segregation on October 20, 2023, without an adjustment. ECF No. 1 at 8. He further avers that he is subject to constant verbal abuse and taunting by the NBCI officers. ECF No. 1-2 at 1. Mr. Rahman seeks "out of this institution," medical treatment, and monetary damages.[2] ECF No. 1 at 9.

## B. Medical Records

It is undisputed that Mr. Rahman's medical records and the attested opinions of healthcare providers reflect as follows:

Mr. Rahman has a history of chronic pain in his right knee from previous injuries. He was seen by LPN Lori Keister on January 25, 2023, along with Dr. Asresahegn Getachew via telemedicine. ECF No. 25-5 at 16–18. At that time, Mr. Rahman was able to walk steadily and independently into the exam room. *Id.* at 16. However, he complained of aching and stiffness; he also reported that he had to wear his knee brace at all times. *Id.* at 20. Dr. Getachew submitted a consult for physical therapy ("PT") and prescribed 500 mg Naproxen, twice daily. *Id.* Utilization Management ("UM") rejected the PT request, finding no medical necessity, and suggested a walking aid, continued home exercise programs, and a follow up to assess effect of the anti-inflammatory medication. *Id.* at 15.

---

[2] The Court notes that Mr. Rahman has since been transferred to Western Correctional Institution. ECF No. 30. Therefore, his request to be removed from NBCI is moot.

The same providers saw Mr. Rahman again on March 6, 2023. ECF No. 25-5 at 8–10. They discussed that he was being scheduled for a sleep study to rule out sleep apnea and UM's rejection of the PT consult. *Id.* at 12. Mr. Rahman was provided with exercise handouts to strengthen his quadriceps. *Id.* Later that month, he was seen in sick call for complaints that he could not walk because of his knee pain. *Id.* at 6–7. He reported that it had "popped" one day and been swollen ever since. *Id.* at 6. Mr. Rahman complained that the medications and exercises were not helping; he was scheduled to see a provider and instructed to continue as directed in the meantime. *Id.*

Mr. Rahman saw PA Adane Negussie on April 3, 2023. ECF No. 25-5 at 2–4. On examination, he had decreased range of motion and mild swelling. *Id.* at 2. Negussie renewed his Naproxen and submitted an MRI request. ECF No. 25-4 at 38–39; ECF No. 25-5 at 1. UM rejected the request, noting Mr. Rahman's history following a previous knee surgery; it was recommended that his outside records be obtained and that he try weight loss, home exercise, and a hinged knee brace. ECF No. 25-4 at 37. He returned to see a provider on April 12, 2023, complaining of knee pain and requesting crutches. *Id.* at 33. PA Christopher Brandon assessed acute pain in his right knee and ordered a cane or crutches for 10 days, RICE (rest, ice, compression, elevation), and continued pain medication. *Id.* at 34–35. Mr. Rahman received his crutches the same day along with a medical ice order. *Id.* at 31.

LPN Keister and Dr. Getachew saw Mr. Rahman again on April 19, 2023. ECF No. 25-4 at 23–30. The swelling in Mr. Rahman's right knee had improved but he still required crutches to walk and was experiencing throbbing pain and popping. *Id.* at 23. A physical examination revealed tenderness on the medial lateral joint lines; Dr. Getachew suspected a ligament injury.

*Id.* at 23–24.  Mr. Rahman's crutches and medical cell were extended for four weeks.  ECF No. 25-5 at 25.  He also received a large knee brace.  *Id.* at 26.

Defendant Mace attests that she saw Mr. Rahman on April 23, 2023, to examine his knee as directed by Dr. Getachew.  ECF No. 25-2 at ¶ 12; ECF No. 25-4 at 15–19.  He reported dull pain which was aggravated by bending.  ECF No. 25-2 at ¶ 12.  Mace observed that he was not wearing the knee brace he had been provided.  *Id.*  His passive and active range of motion were normal and painless.  *Id.*  His gait was abnormal but Mr. Rahman was able to get on the scale and exam table.  *Id.*  "Allodynia (a type of neuropathic pain from a stimulus that normally would not cause pain) was noted with a light touch."  *Id.*  Mace performed several other tests on Mr. Rahman's knee which all produced negative or normal results.  *Id.*  If there was any laxity in the joint, Mr. Rahman had already been ordered a knee sleeve, which Mace noted he was not using as directed.  *Id.* at ¶ 13.  Mace avers that she did not see a medical need for crutches but decided to wait until after reviewing the x-ray resulted to discontinue them.  *Id.*; *see* ECF No. 25-4 at 20.  She continued the Naproxen and educated Mr. Rahman on continuing his exercises, applying ice twice daily, and wearing the knee brace provided.  *Id.* at ¶ 13.  Mace discontinued the medical cell.  *Id.*; ECF No. 25-5 at 27.

Dr. Susan Arnoult saw Mr. Rahman on April 26, 2023; he reported worsening pain following a sudden pop and described his knee as unstable.  ECF No. 25-4 at 12–14.  He stated that he could not do the prescribed exercises because of the pain.  *Id.* at 12.  Dr. Arnoult had Mr. Rahman sign a release of information to obtain records from his prior knee surgery and ordered a repeat x-ray.  *Id.*  She observed swelling in the joint space and decreased range of motion.  *Id.* at 13.  Mr. Rahman's treatment plan included weight loss, home exercises, crutches, review of his surgical records, and an x-ray.  *Id.*  His Naproxen was also renewed.  *Id.* at 14.

Mr. Rahman was seen in sick call on May 4, 2023, by RN Brittany Knox concerning his skin and sleep issues. ECF No. 25-4 at 10–11. During the visit, Mr. Rahman walked into the room using his crutches but Knox noted that officers told her they often see Mr. Rahman climbing on his bunk, cleaning, and doing various other activities without his crutches. *Id.* at 11.

Following a sleep study, Mr. Rahman was diagnosed with mild obstructive sleep apnea and provided with a CPAP machine. ECF No. 28-4 at 14.

An x-ray was completed on May 12, 2023, showing osteoarthritis but no fracture in Mr. Rahman's knee. ECF No. 25-5 at 28. Defendant Mace attests that she saw Mr. Rahman again on May 21, 2023, in sick call. ECF No. 25-2 at ¶ 17; ECF No. 25-4 at 6–9. He allowed limited examination of his knee and it was able to bear his full weight. ECF No. 25-2 at ¶ 17. They discussed that Mr. Rahman's obesity was contributing to his knee pain. *Id.* Mace avers that, in her opinion, there was no indication for crutches because Mr. Rahman was able to walk without them and had been attending outdoor recreation. *Id.* at ¶ 18. She observed him walking from his cell to the library using only one crutch and carrying a stack of papers and was also walking without the knee sleeve. *Id.* According to Mace, Mr. Rahman walked well when he was unaware that Mace was watching him walk to the library but changed his gait when coming into medical, holding his leg stiff and preventing free movement of his knee. *Id.* Upon inquiring with a tier officer, they reported that Mr. Rahman often walked without his crutches and usually only used them when going to medical. *Id.* The officer also told Mace that Mr. Rahman attended outdoor recreation without his crutches and walked laps. *Id.* Mr. Rahman was unable to demonstrate any of the home exercises he had been given, indicating that he had not ever attempted them. *Id.* Mace discontinued Mr. Rahman's crutches and medical cell order but ordered a bottom bunk for him. *Id.*; ECF No. 25-5 at 30.

7

Dr. Arnoult saw Mr. Rahman for a provider visit on June 14, 2023.  ECF No. 25-4 at 1–4. She observed that his knee was tender to palpitation and assessed that his right ACL seemed loose. *Id.* at 3.  Because her assessment and Mace's differed, she noted that she would request security footage to assess how his disability manifested in daily life.  *Id.*  Dr. Arnoult ordered one crutch for Mr. Rahman due to the moderate osteoarthritis, a medical cell, and no work for three months. ECF No. 25-5 at 31.

Dr. Getachew had a telemedicine chronic care visit with Mr. Rahman on July 24, 2023, with the assistance of LPN Keister.  ECF No. 25-3 at 32–36.  After examination, Dr. Getachew suspected a possible reinjury of Mr. Rahman's ACL; he educated Mr. Rahman about exercises to strengthen his quadriceps and to have a provider further evaluate his knee onsite.  *Id.* at 33.  His Naproxen was renewed and a knee brace was provided the following day.  *Id.* at 34; ECF No. 25-5 at 32.

Mr. Rahman returned his crutches on September 19, 2023.  ECF No. 25-3 at 30.  However, on October 4, 2023, Mr. Rahman was brought to medical because his knee gave out, causing him to fall.  *Id.* at 27.  ADON Kristine Swick noted that Mr. Rahman had been released from Housing Unit 1 to property and was pushing his bedding and property up the sidewalk when he fell.  *Id.* at 28.  When he was seen, he said he could not walk and entered the exam room hopping on his left leg but was able to get on the scale and walk to the exam table without difficulty.  *Id.*  Swick noted that Mr. Rahman was guarded during examination; she observed a swollen area on his inner patella region.  *Id.* at 29.  Repeat x-rays on October 10, 2023, again revealed only mild osteoarthritis.  ECF No. 25-5 at 34–35.

Dr. Arnoult saw him again on October 19, 2023.  ECF No. 25-3 at 23-26.  Mr. Rahman reported that he was doing exercises but struggled due to the pain, instability, and swelling.  *Id.*

at 23.  She assessed that his medial MCL seemed loose and his ACL is slightly lax as well as swelling and tenderness.  *Id.* at 25.  She concluded that Mr. Rahman needed an MRI and orthopedic consult.  *Id.* at 19–20, 25.  UM approved the MRI request and it was completed on December 20, 2023.  *Id.* at 21–22; ECF No. 25-5 at 36.  The radiologist concluded that the MRI showed "advanced degenerative changes of the patellofemoral and femorotibial joints" and a "degenerative tear and extrusion of the medial meniscus."  ECF No. 25-5 at 36.  Defendant Mace avers that physical therapy is the first mode of treatment for a meniscus tear.  ECF No. 25-2 at ¶ 30.  She states that patients like Mr. Rahman do not show significant functional improvement with arthroscopic surgery compared to a good physical therapy program.  *Id.*  Dr. Arnoult requested an orthopedics consultation on December 22, 2023, noting the MRI results and that more conservative measures had not been successful.  ECF No. 25-3 at 10–12.  UM rejected the request finding that medical necessity had not been demonstrated; the physician noted there was no support for sustained locking of Mr. Rahman's knee.  *Id.* at 13–15.  Formal physical therapy was recommended with reevaluation in 12 weeks.  *Id.* at 14.

A request for an initial PT evaluation was approved.  ECF No. 25-3 at 8–9.  Stephen Ryan saw Mr. Rahman on January 24, 2024, and recommended eight PT sessions for strengthening his right hip and knee.  *Id.*  He was later approved for an additional eight sessions.  ECF No. 25-7 at 6–7.  Mr. Rahman's improvement was noted after the initial sessions; he was still using a single crutch for support.  *Id.* at 19.

### C.  Grievances and Disciplinary Records

It is undisputed that Mr. Rahman's facility records reflect as follows:

Mr. Rahman filed ARP (Request for Administrative Remedy) No. NBCI-4037-23 on May 4, 2023, complaining that he was placed on lockup from April 8 through 12, 2023, due to a

fabricated adjustment report during which he was denied access to religious services.  ECF No. 28-3 at 2–3.  Warden Nines dismissed the ARP on June 29, 2023, finding that his grievance was meritless and informing Mr. Rahman that inmates in a special management unit are not permitted to attend religious services but may practice in their cell and that his property issues had been addressed in a different ARP.  *Id.* at 2.  Mr. Rahman makes no allegations against Sgt. Iames in this grievance.  *See id.* at 2–3.  The allegedly fabricated adjustment was dismissed because the institution decided not to pursue the rule violations.  *See* ECF No. 28-3 at 10.  Mr. Rahman was also housed in administrative segregation pending a disciplinary adjustment from September 22 through October 4, 2023.  ECF No. 28-3 at 4.

## STANDARDS OF REVIEW

### A.  Motion to Dismiss

Defendants' Motions are styled as motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment under Federal Rule of Civil Procedure 56.  A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty.*, 788 F. Supp. 2d 431, 436–37 (D. Md. 2011).  Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss."  *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).  Under Rule 12(b)(6), however, a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).  If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d); *Adams Hous., LLC v. City of Salisbury, Maryland*, 672 F. App'x 220, 222 (4th Cir. 2016) (*per curiam*).  As is the case here, when a movant titles its motion "in the

alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk S. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Adams Housing, LLC*, 672 F. App'x 220 at 222 ("The court must give notice to ensure that the party is aware that it must 'come forward with all of [its] evidence.'") (citation omitted).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C Wright & Miller, FEDERAL PRACTICE & PROC. § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165, 167.

### B. Discovery

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448–49 (4th Cir. 2011); *see Putney v. Likin*, 656 F. App'x 632, 638–39 (4th Cir. 2016) (*per curiam*); *McCray v. Maryland Dep't of Transp.*, 741 F.3d 480, 483 (4th Cir. 2014). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. FED. R. CIV. P. 56(d); *see also Harrods Ltd.*, 302 F.3d at 244–45 (discussing affidavit requirement of former Rule 56(f)).

"[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs. LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trustees, Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods Ltd.*, 302 F.3d at 244 (citations omitted). Despite the absence of the non-moving party's Rule 56(d) affidavit, the court shall not issue a summary judgment ruling that is obviously premature. Although the Fourth Circuit places "'great weight'" on the Rule 56(d) affidavit, and holds that mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted).

Failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Harrods Ltd.*, 302 F.3d at 244–45 (internal citations omitted); *see also Putney*, 656 F. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). Moreover, "[t]his is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 F. App'x at 638.

### C. Summary Judgment

Summary judgment is governed by Federal Rule of Civil Procedure 56(a), which provides in pertinent part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48(1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting FED. R. CIV. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002); *see F.D.I.C. v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Moreover, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644–45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility.

Nevertheless, to defeat summary judgment, conflicting evidence, if any, must give rise to a genuine dispute of material fact. *See Anderson*, 477 U.S. at 247–48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id.* at 248; *Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so

14

one-sided that one party must prevail as a matter of law." 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Because Mr. Rahman is self-represented, his submissions are liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). That notwithstanding, the court must also abide the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993) and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

## DISCUSSION

### A. Medical Defendants

#### 1. YesCare

Medical Defendants assert that YesCare must be dismissed because Mr. Rahman makes no allegations against YesCare in the Complaint. ECF No. 25-1 at 17. Liability under § 1983 attaches only upon personal participation by a defendant in the constitutional violation. *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001). Other than being named in the caption of the Complaint, YesCare is not mentioned anywhere in the factual allegations. Therefore, YesCare must be dismissed.[3]

---

[3] Mr. Rahman asserts in his opposition that YesCare "dropped the ball" on several occasions. ECF No. 33 at 5. This is insufficient to state a viable claim for relief as he fails to allege any facts which, even accepted as true, could establish that YesCare, a private corporation, had a policy or custom which led to the alleged constitutional violations. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). A private corporation is not liable under § 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of *respondeat superior*. *See Austin v. Paramount Parks, Inc.,* 195 F.3d 715, 727–28 (4th Cir. 1999); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982); *Clark v. Maryland Dep't of Public Safety and Correctional Services,* 316 Fed. Appx. 279, 282 (4th Cir. 2009).

### 2. Nurse Burnice Mace, NP

Medical Defendants contend that Defendant Mace is entitled to summary judgment because Mace did not subjectively believe that Mr. Rahman was at substantial risk of serious harm. ECF No. 25-1 at 18–21. To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff suffered from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or to ensure it was available. *Farmer v. Brennan*, 511 U.S. 825, 834–37 (1994); *Heyer v. United States Bureau of Prisons*, 849 F.3d 202, 209–10 (4th Cir. 2017); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *Farmer*, 511 U.S. at 839, 840; *Anderson*, 877 F.3d at 544. Under this standard, "the prison official must have both 'subjectively recognized a substantial risk of harm' and 'subjectively recognized that his[/her] actions were inappropriate in light of that risk.'" *Anderson*, 877 F.3d at 545 (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk.").

"Actual knowledge or awareness on the part of the alleged inflicter … becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'"  *Brice v. Virginia Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).  The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious."  *Scinto v. Stansberry*, 841 F.3d 219, 226 (4th Cir. 2016) (quoting *Farmer*, 511 U.S. at 842).  If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted."  *Farmer*, 511 U.S. at 844; *see also Cox v. Quinn*, 828 F.3d 227, 236 (4th Cir. 2016) ("[A] prison official's response to a known threat to inmate safety must be reasonable.").  Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time.  *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2001) (citing *Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)); *see also Jackson*, 775 F.3d at 179 (physician's act of prescribing treatment raises fair inference that he believed treatment was necessary and that failure to provide it would pose an excessive risk).

Medical Defendants do not dispute that Mr. Rahman's knee injury constitutes a serious medical need.  Therefore, the Court turns to whether a genuine dispute of fact exists as to whether Defendant Mace acted with deliberate indifference.

As set forth above, the following facts are undisputed: Dr. Mace first saw Mr. Rahman on referral from Dr. Getachew for a physical examination of his knee; and that she performed several tests to evaluate the function in Mr. Rahman's knee, which were all negative or normal.  Dr. Mace

concluded Mr. Rahman was experiencing some neuropathic pain to the touch.  Even though Mr. Rahman was not compliant with wearing his knee sleeve, Mace did not discontinue his crutches at this time, waiting instead for the x-ray results.  However, she did discontinue his medical cell. During their next appointment, Mace reviewed the x-ray results which did not reveal any acute injury but did show osteoarthritis.  Mr. Rahman did not allow her to closely examine his knee but she observed that it was fully weightbearing.  Accordingly, Mace found no medical indication for crutches and discontinued the order.  She also personally observed him walking without the crutches when he was unaware he was being watched.  Nevertheless, Mr. Rahman still received a bottom bunk order.

Mace attests, and Mr. Rahman does not ably dispute, that her decision to discontinue his crutches was not influenced by any of the correctional officers.  Rather, the record is undisputed that she made this decision based on her personal evaluation of Mr. Rahman's knee and review of the x-ray results.  Furthermore, having ensured that he was prescribed pain medication, provided with a knee sleeve, and educated on an exercise program (all undisputed record facts), the Court does not find that Mace deliberately disregarded a substantial risk of harm.  Mr. Rahman's apparent disagreement with Mace's treatment plan is insufficient to establish her deliberate indifference.[4] *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)) ("Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged"); *accord*

---

[4] Mr. Rahman also seems to argue that his denial of a medical cell violates the Americans with Disabilities Act.  ECF No. 33 at 4.  Mr. Rahman may not raise new claims in his opposition and, therefore, the Court will not consider this argument or claim.  *Mylan Lab'ys, Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1068 (D. Md. 1991) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984)), *aff'd*, 2 F.3d 56 (4th Cir. 1993); *see also Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998); *Woodbury v. Victory Van Lines*, 286 F. Supp. 3d 685, 692 (D. Md. 2017) (stating it is axiomatic that a plaintiff may not use their memorandum in opposition to amend the complaint).

*Jackson*, 775 F.3d at 178 ("[W]e consistently have found such disagreements to fall short of showing deliberate indifference."). The Court also finds Mr. Rahman's argument that Mace was defying a doctor's orders by discontinuing his crutches and medical cell are unavailing (ECF No. 33 at 3–4, 5) because nothing in the record shows that Mace, a Certified Registered Nurse Practitioner, cannot (and did not) independently diagnose and treat a patient.

Additionally, several of Mr. Rahman's complaints about his medical care were not Mace's responsibility. He complains that there was a delay in initially receiving crutches following his injury but this occurred prior to Mace's involvement in his treatment. *See* ECF No. 33 at 3. Mr. Rahman also contends that earlier orders for PT and an MRI would have prevented his injury from getting worse. *Id.* at 5. The record is undisputed, however, that an MRI was originally requested on April 3, 2023, by PA Negussie prior to his appointment with Mace. The MRI request was rejected by UM, not Mace. It is further undisputed that his medical records reflect that on various occasions, it was noted that Mr. Rahman was not compliant with the home exercise program, which could have prevented further injury. Mr. Rahman was referred to PT immediately after a later MRI revealed a meniscus tear. Mace attests, and Mr. Rahman does not effectively challenge, that this is the first treatment option and that surgical intervention has not shown better results than a good PT program for such an injury. Again, Mr. Rahman's disagreement with his provider's treatment plan does not establish a constitutional violation. Mace is therefore entitled to summary judgment in her favor.

### B. State Defendants

State Defendants assert that the Complaint should be dismissed or, alternatively, they are entitled to summary judgment because (1) the State Defendants are immune from suit in their official capacities, (2) Mr. Rahman makes no factual allegations against Warden Nines, (3) the

State Defendants did not participate in Mr. Rahman's medical treatment, (4) Mr. Rahman fails to allege any constitutional violations against Sgt. Iames, (5) Mr. Rahman fails to demonstrate a constitutional violation by Sgt. Judy because he did not suffer any serious physical or emotional injury, and (6) the State Defendants are entitled to qualified immunity.[5]  ECF No. 28-1.

### 1.  Warden Nines

Officials like Warden Nines may be found liable if the plaintiff shows the official "acted personally in the deprivation of the plaintiff['s] rights."  *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (quoting *Bennett v. Gravelle*, 323 F. Supp. 203, 214 (D. Md. 1971)).  To state a claim for supervisory liability under § 1983 based on a subordinate's conduct, the plaintiff must allege that (1) the supervisor had actual or constructive knowledge that the subordinate's conduct "posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff" (2) the supervisor responded in a manner that was so inadequate that it showed "deliberate indifference to or tacit authorization" of the subordinate's conduct; and (3) there was "an affirmative causal link between the supervisor's inaction" and the plaintiff's constitutional injury.  *Timpson by & through Timpson v. Anderson Cnty. Disabilities & Special Needs Bd.*, 31 F.4th 238, 257 (4th Cir. 2022) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).

Mr. Rahman asserts in his opposition that Nines was aware of his staff's actions (outside the ARP that he filed and Nines dismissed), because Mr. Rahman verbally told Nines of his issues as well as wrote letters to him on several occasions.  ECF No. 33 at 2.  Mr. Rahman contends that discovery would demonstrate his involvement.  *Id.*  Even had Warden Nines been informed of Mr. Rahman's problems with the Defendant officers, such awareness or knowledge alone would not

---

[5] Mr. Rahman's Complaint is silent as to whether he sues Defendants in their official or personal capacities.  As such, the Court will construe his allegations against the State Defendants in their personal capacities only and will not address their argument regarding Eleventh Amendment immunity.

support the conclusion that Nines personally participated in a constitutional violation; but it may support a finding of supervisory liability. As this case will proceed to discovery concerning the constitutional violations alleged against Sgt. Iames and Sgt. Judy, as discussed below, the Court is not inclined to dismiss Warden Nines at this time in light of Mr. Rahman's allegations that Warden Nines was personally informed of their alleged misconduct.

### 2. Lt. Brewer

The State Defendants argue they did not personally participate in or interfere with Mr. Rahman's medical care. ECF No. 28-1 at 8–9. As Mr. Rahman only makes allegations against Lt. Brewer concerning his medical care, the Court does not construe this claim against either Sgts. Iames or Judy. Mr. Rahman speculatively alleges that Lt. Brewer told Defendant Mace to take his crutches away. As discussed, however, nothing in the allegations (or record) supports a conclusion that Mace was instructed by any security staff to discontinue Mr. Rahman's crutches. (And the record contains undisputed attested facts that Mace made that decision following physical examination and imaging results. *See* ECF No. 28-4 at 11–12.) Mr. Rahman asserts the medical records demonstrate (or support a conclusion that) both Defendant Mace and Nurse Knox discussed his injury with officers and that these reports influenced their decision. ECF No. 33 at 8. Notably, however, neither of the records to which he refers (ECF No. 25-4 at 8, 11) identifies any particular officer. But even were it the case that the medical providers shared their personal observations with a named officer, nothing about that tends to demonstrate or support a finding of intent to deny Mr. Rahman his crutches. Further, correctional personnel generally are not liable for deliberate indifference when medical staff make the challenged decisions about medical care. *See Miltier v. Beorn*, 896 F.2d 848, 854–55 (4th Cir. 1990) (noting that a warden was entitled to rely upon the health care providers' expertise); *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)

(stating that "[i]f a prisoner is under the care of medical experts ... a non-medical prison official will generally be justified in believing that the prisoner is in capable hands"); *Shelton v. Angelone*, 148 F. Supp. 2d 670, 678 (W.D. Va. 2001) ("Prison personnel may rely on opinion of the medical staff as to the proper course of treatment.").

Although Mr. Rahman alleges that Lt. Brewer made him walk back to his unit from medical without assistance, this is plainly and materially contradicted by the Notice of Inmate Rule Violation (NOIRV) he submits at ECF No. 33-1 at 2. The NOIRV, written by Lt. Brewer, states that Mr. Rahman, who was sitting in a wheelchair, refused to walk back to his tier unassisted; and that Lt. Brewer confirmed with medical staff that Mr. Rahman did not have an order for crutches or a wheelchair before instructing him, once again, to return on foot to his tier. *Id.* Mr. Rahman fails to generate a dispute of material fact on this issue. As such, in neither instance did Lt. Brewer interfere with Mr. Rahman's medical care. He is therefore entitled to summary judgment in his favor.

### 3. Sgt. Iames

State Defendants contend that none of Mr. Rahman's allegations against Sgt. Iames presents a constitutional violation. ECF No. 18-1 at 9–10. However, it appears that the State Defendants miss the thrust of Mr. Rahman's allegations against Sgt. Iames. He does not allege that he lost his job placement, lost his single cell, was given a false disciplinary ticket, and was not allowed to return to his tier after his time in disciplinary segregation as isolated incidents. Rather, he asserts that these were adverse actions taken by Sgt. Iames in retaliation for Mr. Rahman confronting Sgt. Bulger about the racism he and others experienced on the tier. *See* ECF No. 1.

"[T]he constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large," but "incarceration does not divest

prisoners of all constitutional protections." *Shaw v. Murphy*, 532 U.S. 223, 228–29 (2001). "[A] prison inmate retains those First Amendment rights that are not inconsistent with the status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Although prisoners retain First Amendment rights, those rights are not unlimited and may be curtailed by prison officials under appropriate circumstances. *Jones v. N. Carolina Prisoners' Lab. Union, Inc.*, 433 U.S. 119, 125 (1977) (upholding prison regulations limiting prisoner's speech regarding the operation of a prisoner union).

"The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). To state a claim of retaliation for exercising a First Amendment right, a plaintiff must allege that: (1) the plaintiff engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected the First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendant's conduct. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005); *cf. Laurent-Workman v. Wormuth*, 54 F.4th 201, 212 (4th Cir. 2022) (outlining elements of a Title VII retaliation claim).

A plaintiff may establish retaliatory conduct if the defendant took an action against the plaintiff that "would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights." *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (quotation marks and citation omitted). A plaintiff must also demonstrate a causal connection between his First Amendment activity and the alleged retaliatory action. *See Constantine*, 411 F.3d at 501. The showing can be based on circumstantial evidence, such as evidence that the defendant was aware

of the First Amendment activity, and that the retaliatory act was temporally proximate to that activity. *Id.*

In the prison context, courts "treat [claims of retaliation] with skepticism because 'every act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'" *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (citing *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994)). As such, an inmate cannot simply assert a generalized retaliatory animus but must allege facts that support the claim of retaliation. *White v. White*, 886 F.2d 721, 724 (4th Cir. 1989). Moreover, a retaliation claim fails if there is a legitimate reason for the alleged retaliatory action. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

Mr. Rahman has met his burden to state a claim for retaliation. He alleges that he had a conversation Sgt. Bulger about the racism he and others experienced from officers on the tier. Sgt. Iames, who Mr. Rahman alleges is assigned to the building, learned of this conversation and immediately removed him from his work placement (ECF 33-1 at 1) and from his single cell. Additionally, he instructed Officer Hochard to write him a false NOIRV (ECF No. 28-3 at 5) sending him to disciplinary segregation after which Sgt. Iames would not let him return to his honor building and, instead, sent him to the "worst" building at NBCI. As Sgt. Iames fails to adequately respond to Mr. Rahman's claims against him, the Motion will be denied.

### 4. Sgt. Judy

State Defendants argue Mr. Rahman fails to establish that he suffered a significant physical or emotional injury as a result of being unable to use his CPAP machine while in an administrative segregation cell without electricity. ECF No. 28-1 at 10–11. The Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned." *Iko v. Shreve*, 535 F.3d 225,

238 (4th Cir. 2008) (quoting *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996)).  Conditions

of confinement that "involve wanton and unnecessary infliction of pain," or which "deprive

inmates of the minimal civilized measure of life's necessities," may amount to cruel and unusual

punishment.  *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  However, conditions that are merely

restrictive or even harsh "are part of the penalty that criminal offenders pay for their offenses

against society."  *Id.*  In order to establish the imposition of cruel and unusual punishment in

conditions of confinement, a prisoner must prove two elements: that "'the deprivation of [a] basic

human need was *objectively* sufficiently serious,' and that *subjectively* the officials act[ed] with a

sufficiently culpable state of mind.'"  *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (citation

omitted).  "These requirements spring from the text of the amendment itself; absent intentionality,

a condition imposed on an inmate cannot properly be called 'punishment,' and absent severity,

such punishment cannot be called 'cruel and unusual.'"  *Iko*, 535 F.3d at 238 (quoting *Wilson v.

Seiter*, 501 U.S. 294, 298–300 (1991)).

  The objective prong of a conditions claim requires the prisoner to "'produce evidence of a

serious or significant physical or emotional injury resulting from the challenged conditions,' or

demonstrate a substantial risk of such serious harm resulting from the prisoner's unwilling

exposure to the challenged conditions." *Shakka*, 71 F.3d at 166 (quoting *Strickler v. Waters*, 989

F.2d 1375, 1381 (4th Cir. 1993)).  Thus, "a condition of confinement that is sure or very likely to

cause serious illness and needless suffering the next week or month or year" violates the Eighth

Amendment, even if "the complaining inmate shows no serious current symptoms." *Helling v.

McKinney*, 509 U.S. 25, 33–34 (1993); *Webb v. Deboo*, 423 F. App'x 299, 300 (4th Cir. 2011).

Here, Mr. Rahman incorporates the certified medical records into his opposition, stating that he

had been provided the CPAP machine after a finding that he had mild obstructive sleep apnea,

which had in the past caused him to stop breathing while asleep.  *See* ECF No. 25-7 at 2; ECF No. 28-4 at 14–16.  The Court disagrees with State Defendants that Mr. Rahman fails to meet this element.  He has, at minimum, alleged specific facts to support a conclusion that without the CPAP machine he was at substantial risk of not being able to breathe while sleeping.  Even though he may not have actually suffered such a serious injury during his time in segregation, he has alleged a sufficiently serious risk.

To establish a sufficiently culpable state of mind, there must be evidence of deliberate indifference such that a known excessive risk of harm to the inmate's health or safety was disregarded.  *See Wilson*, 501 U.S. at 302–303 (applying the deliberate indifference standard to conditions of confinement claims).  "[T]he test is whether the guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so."  *Brown v. N. Carolina Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)).  The State Defendants do not address the subjective element of Mr. Rahman's claim.  Construing the facts in the light most favorable to Mr. Rahman, the Court finds that he has alleged that Sgt. Judy knowingly kept him in the cell despite having been informed by Mr. Rahman that he needed his CPAP machine to breathe while sleeping.  ECF No. 1 at 7; *see also* ECF No. 33 at 9.

## CONCLUSION

For the foregoing reasons, the Medical Defendants' Motion is granted and the State Defendants' Motion is granted only as to Lt. Brewer.  The Complaint is dismissed against YesCare.  Summary Judgment is granted in favor of Defendants Mace and Brewer.

As this case will proceed to discovery as to Mr. Rahman's remaining claims, the Court will appoint an attorney to represent Mr. Rahman. Defendants Nines, Judy, and Iames shall file an answer within 30 days.

A separate Order follows.

February 3, 2025

/S/
_____
Julie R. Rubin
United States District Judge